MANNING CURTIS BRADSHAW
   & BEDNAR PLLC
Alan C. Bradshaw, #4801
Mitch M. Longson, #15661
136 E. South Temple, Suite 1300
Salt Lake City, Utah 84111
Telephone: (801) 363-5678
Facsimile: (801) 364-5678
abradshaw@mc2b.com
mlongson@mc2b.com

*Attorneys for Plaintiff*

## IN THE THIRD JUDICIAL DISTRICT COURT OF SALT LAKE COUNTY STATE OF UTAH

| | |
|---|---|
| KTS HOLDINGS LLC d/b/a SOAR TRANSPORTATION GROUP | **SUMMONS** |
| Plaintiff, | Civil No. 200900902 |
| v. | Judge Todd M. Shaughnessy |
| THE HANOVER INSURANCE COMPANY, | |
| Defendant. | |

THE STATE OF UTAH TO THE ABOVE-NAMED DEFENDANT:

     The Hanover Insurance Company
     Registered Agent: CT Corporation System
     1108 E. South Union Ave.
     Midvale, UT  84047-2904

     You are hereby summoned and required to file an Answer in writing to the Complaint,

which has been filed with the Court and is herewith served upon you, with the Clerk of the

above-entitled Court at 450 South State Street, Salt Lake City, UT 84111, and serve upon or mail

to Plaintiff's attorney, Alan C. Bradshaw of Manning Curtis Bradshaw & Bednar PLLC, 136 East

South Temple, Suite 1300, Salt Lake City, Utah  84111, a copy of said Answer within thirty (30)

days after service of said Complaint upon you.

      If you fail to do so, judgment by default will be taken against you for the relief demanded

in said Complaint.

      DATED this 4th day of February, 2020.

                       MANNING CURTIS BRADSHAW & BEDNAR LLC

                       Alan C. Bradshaw
                       Attorneys for Plaintiff

*Exhibit A - Page 2*

### THIRD DISTRICT COURT SALT LAKE CITY, COUNTY OF SALT LAKE

| | |
|---|---|
| Plaintiff/Petitioner: **KTS Holdings LLC dba Soar Transportation Group**<br><br>vs.<br><br>Defendant/Respondent: **The Hanover Insurance Company** | **PROOF OF SERVICE**<br>Case No: **200900902**<br>Court Date/Time: **00/00/0000 / 12:00 AM**<br>Court Room: |

Legal documents received by Statewide Process Servers on the 4th day of February, 2020 at 12:25 PM to be served on:

**The Hanover Insurance Company, Reg Agent CT Corp**
1108 E South Union Ave
Midvale, UT 84047

I, **Adam Robins**, am over the age of 18, I am not a party to this action, and I am not an attorney for a party to this action. On the **4th February, 2020 at 02:02 PM**, I did the following:

**Corporate Serve:** By personally handing the legal document(s) with a conformed copy of this **SUMMON AND COMPLAINT AND DEMAND FOR JURY TRIAL** to **Holli Tharp**, **REGISTERED AGENT**, at **1108 E South Union Ave, Midvale, UT 84047** at approximately **02:02 PM** on **4th February, 2020**.

Description of Person Accepting Service:
Female, White, Brown hair, Approx. Age: 30 years, Approx. Height: 5 ft 6 in., Approx. Weight: 125 lbs.

**Supplemental Data Appropriate to this Service:**

• 1108 E South Union Ave , Midvale, UT 84047:
2/4/2020 2:02 PM:

I have not included any non-public information in this document.

I declare under criminal penalty under the law of Utah that the foregoing is true and correct.

X_____
Adam Robins - PI# A103445
Statewide Process Servers
PO Box 845
West Jordan, UT, 84084
801-809-4133
**Manning Curtis Brandshaw and Bednar**
**136 e South Temple #1300**
**Salt Lake City, UT 84111**
**(801) 363-5678**
**Atty File#: 200900902**
**Invoices - leliason@mc2b.com**

Service
Fee:
**$35.00**



175130  175130  175130  175130  175130  175130

*Exhibit A - Page 3*

MANNING CURTIS BRADSHAW
  & BEDNAR PLLC
Alan C. Bradshaw, #4801
Mitch M. Longson, #15661
136 E. South Temple, Suite 1300
Salt Lake City, Utah 84111
Telephone: (801) 363-5678
Facsimile: (801) 364-5678
abradshaw@mc2b.com
mlongson@mc2b.com

*Attorneys for Plaintiff*

---

**IN THE THIRD JUDICIAL DISTRICT COURT OF SALT LAKE COUNTY**

**STATE OF UTAH**

---

| | |
|---|---|
| KTS HOLDINGS LLC d/b/a SOAR TRANSPORTATION GROUP<br><br>      Plaintiff,<br><br>v.<br><br>THE HANOVER INSURANCE COMPANY,<br><br>      Defendant. | **COMPLAINT AND DEMAND FOR JURY TRIAL**<br>**(Tier 3)**<br><br>Civil No. 200900902<br><br>Judge Todd M. Shaughnessy |

---

Plaintiff KTS Holdings LLC d/b/a Soar Transportation Group ("Soar"), by and through

undersigned counsel, complains against The Hanover Insurance Company ("Hanover") as follows:

## PARTIES

1.      Plaintiff Soar is a Delaware limited liability company engaged in the

transportation business with a business location in West Valley City, Utah.

2.      Hanover is an insurance company engaged in the business of providing insurance

to policyholders like Soar.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over the subject matter in this action pursuant to Utah Code §§ 78A-5-102 and 78B-6-401.

4.     Venue is proper in this Court pursuant to Utah Code § 78B-3-307.

5.     Soar designates this as a Tier 3 action under the Utah Rules of Civil Procedure because the amount of damages exceeds $300,000.

## FACTUAL BACKROUND

6.     Hanover was at all relevant times engaged in the business of selling insurance. Hanover entered into a contract of insurance, policy number BDY-1050709-03 (the "Policy"), providing Crime Coverage to Soar for the period from May 1, 2019 to May 1, 2020.  Premiums were paid for this coverage.  A copy of the Policy is attached hereto as Exhibit A.

7.     The Policy provides Crime Coverage to Soar including "Fidelity Coverage" for an employee's theft subject to a limit of liability of $1,000,000 and a retention of $10,000.  The Crime Coverage also provides coverage for "Investigative Expense."

8.     Between May 25, 2018 and March 27, 2019, Roscoe Atkinson, an employee of Soar at such times, took for himself $814,799.81 of Soar's money.  Soar has also incurred $181,713.44 in Investigative Expense through August 6, 2019.  Soar has incurred additional Investigative Expense since August 6, 2019 in connection with its loss (collectively "Losses").

9.     Soar provided Hanover with timely notice of its Losses including timely submission of a signed and sworn Proof of Loss ("POL").

10.    On October 14, 2019 Hanover denied all coverage for Soar's Losses ("Denial") including denial of coverage for Fidelity Coverage (and employee theft) and Investigative Expense.  A copy of Hanover's Denial is attached hereto as Exhibit B.

11.     In denying coverage, Hanover has not asserted that the Policy provisions for Fidelity Coverage and Investigative Expense do not cover Soar's Losses, including Hanover has not identified any exclusion or other limitation upon the coverage provided to Soar for such Losses.  Instead, Hanover has denied coverage solely on the basis that Soar allegedly made material misrepresentations in connection with a renewal application dated April 29, 2019 (the "2019 Application") and an application allegedly dated April 20, 2016 (actually dated May 20, 2019 and addressed to Travelers not Hanover) (the "2016 Application").

12.     Neither the 2019 Application nor the 2016 Application are attached to or made a part of the Policy and such applications are not part of the Policy's terms under the Utah Insurance Code § 31A-21-106(1)(a), which does not permit incorporation by reference in insurance policies. To the extent the Policy language purports to incorporate the 2019 Application by reference, such incorporation by reference language is not effective under the Utah Insurance Code.  Additionally, the language of the Policy expressly does not incorporate by reference the non-"warranty" answers to questions in the 2016 Application.

13.     Hanover has also not sought to timely pursue a claim for rescission of the Policy. Hanover is prohibited from pursuing such a remedy under the Policy which states: "The **Insurer** shall not be entitled under any circumstances to void or rescind this Policy with respect to any **Insured**." *See* Policy XIX.  Additionally, Hanover has not timely pursued rescission under the Utah Insurance Code § 31A-21-105(5) which requires that a misrepresentation or rescission claim be asserted, if at all, within 60 days after "the insurer acquired knowledge of sufficient fact to constitute a general defense to all claims under the Policy."  The facts Hanover claims constitute a general defense were known by Hanover no later than August 6, 2019 and were not timely pursued under § 31A-21-105(5).

14.     Hanover also has no basis to deny coverage based upon the 2019 Application or the 2016 Application.  The 2019 Application and the 2016 Application are not part of the Policy language, and Hanover has failed to timely assert a general defense under Utah Code § 31A-21-105(5).

15.     Hanover has also failed to identify a basis to deny coverage under Utah Code § 31A-21-105 including it cannot identify in the 2019 Application or the 2016 Application any misrepresentations; Hanover did not rely upon any alleged misrepresentations in the 2019 Application or the 2016 Application; any alleged misrepresentations in the 2019 Application or the 2016 Application were not material and were not made with an intent to deceive; and any alleged misrepresentations in the 2019 Application and the 2016 Application did not contribute to Soar's Losses.

16.     Additionally, Hanover's reliance on an alleged non-disclosure of information not requested by Hanover on an application is not a defense to an action against Hanover under the Policy.  *See* Utah Code § 31A-21-105(4).  The 2016 Application in particular does not include any information requested by Hanover and under Utah Code § 31A-21-105(4) Hanover cannot rely upon information not requested by Hanover.

17.     By denying coverage to Soar based upon language within documents that are not part of the Policy and that Hanover knew or should have known were truthful or innocently misstated, non-material, and not relied upon by Hanover, Hanover breached the Policy's covenant of good faith and fair dealing.  Among other conduct, Hanover failed to determine whether Soar's claim is valid, it failed to fairly evaluate Soar's claim, and it failed to act promptly and reasonably in rejecting the claim.  Hanover's wrongful conduct damaged Soar.

18.     Hanover has also wrongfully based its coverage denial on "facts" that it knows or that it has been informed are untrue.  These "facts" include Hanover's untrue assertion that on May 20, 2016 and on April 29, 2019 the individuals who performed bank statement reconciliations for Soar also had check writing authority.  Hanover knows that such "facts" are untrue.  On May 20, 2016 the individuals with check writing authority were Kelle Simon and Julie Simon and they did not at that time perform bank statement reconciliations for Soar.  On April 29, 2019 the individuals associated with Soar with check writing authority were Raun Singleton and Cody D. Isaacson and they did not at that time perform bank statement reconciliations.  As of April 29, 2019, Roscoe Atkinson was no longer employed by Soar.

## FIRST CAUSE OF ACTION

### (Declaratory Judgment)

19.     Soar incorporates the allegations contained in paragraphs 1 - 17 as though set forth herein verbatim.

20.     Soar is the policyholder under the Policy.

21.     Hanover is obligated under the Policy to pay all of Soar's Losses (including Fidelity Coverage and Investigative Expense) in connection with the conduct of Roscoe Atkinson.

22.     An actual controversy exists between Soar and Hanover regarding Hanover's obligation to pay Soar's Losses in connection with the conduct of Roscoe Atkinson.

23.     Soar seeks a judicial declaration, pursuant to Utah Code § 78B-6-401, of the obligation of Hanover to pay Soar's Losses in connection with the conduct of Roscoe Atkinson.

## SECOND CAUSE OF ACTION

### (Breach of Contract)

24.     Soar incorporates the allegations contained in 1 – 22 as though set forth herein verbatim.

25.     The Policy obligates Hanover to pay Soar for its Losses (including Fidelity Coverage and Investigative Expense) in connection with the conduct of Roscoe Atkinson.

26.     Hanover has breached the Policy by failing to timely pay Soar's Losses in connection with the conduct of Roscoe Atkinson.

27.     As direct and proximate result of Hanover's breach of contract, Soar has suffered damages in the amount to be proven at trial.

## THIRD CAUSE OF ACTION

### (Breach of Covenant of Good Faith and Fair Dealing)

28.     Soar incorporates the allegations contained in paragraphs 1 - 26 as though set forth herein verbatim.

29.     The Policy contains an implied covenant of good faith and fair dealing.

30.     Hanover has breached its obligation of good faith and fair dealing as a result of the conduct described above including its denial of coverage based solely upon applications that are not a part of the Policy and for which Hanover cannot meet its burdens under Utah Code § 31A-21-105.  Hanover also bases its coverage denial on facts it knows to be untrue.

31.     As a direct and proximate result of the breach of the covenant of good faith and fair dealing, Soar has suffered damages in an amount to be proven at trial.  These damages include, but are not limited to, business losses, and attorneys' fees of the greater of hourly fees and costs as paid by Soar or 40% of Soar's Losses of not less than $996,513.25.

WHEREFORE, Soar requests judgment as follows:

1.      On the First Cause of Action, for a declaratory judgment as follows:

      (a)      That Hanover must pay for Soar's Losses in connection with the conduct of Roscoe Atkinson including all amounts requested in Soar's POL and a declaration that Hanover may not rely upon the 2019 Application or the 2016 Application to deny coverage to Soar;

      (b)      For such other and further relief as the Court deems just and proper.

2.      On the Second Cause of Action, as follows:

      (a)      For damages according to proof at trial;

      (b)      For pre- and post-judgment interest according to law;

      (c)      For such other and further relief as the Court deems just and proper.

3.      On the Third Cause of Action, as follows:

      (a)      For damages according to proof at trial;

      (b)      For pre- and post-judgment interest according to law;

      (c)      For Soar's attorneys' fees, costs and expenses of this action;

      (d)      For business losses and/or other consequential damages;

      (e)      For such other and further relief as the Court deems just and proper.

DATED this 3rd day of February, 2020.

      **MANNING CURTIS BRADSHAW & BEDNAR PLLC**

      /s/ Alan C. Bradshaw
      Alan C. Bradshaw
      Mitch M. Longson
      *Attorneys for Soar*

# EXHIBIT A



**HANOVER**

# Private Company Advantage

## Policy Declarations

**NOTICE: THE LIABILITY COVERAGE PARTS ARE WRITTEN ON A CLAIMS-MADE BASIS. SUBJECT TO ITS TERMS, THIS POLICY APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD OR ANY APPLICABLE EXTENDED REPORTING PERIOD. THE LIMITS OF LIABILITY CAN BE COMPLETELY EXHAUSTED BY DEFENSE EXPENSES AND DEFENSE EXPENSES WILL BE APPLIED AGAINST THE RETENTION. THE INSURER WILL HAVE NO LIABILITY FOR DEFENSE EXPENSES OR THE AMOUNT OF ANY JUDGMENT OR SETTLEMENT IN EXCESS OF THE APPLICABLE LIMIT OF LIABILITY.**

**PLEASE READ THE ENTIRE POLICY CAREFULLY.**

| **Policy Number** | **The Hanover Insurance Company** |
|---|---|
| BDY-1050709-03 | 440 Lincoln Street<br>Worcester, Massachusetts  01653<br>(A Stock Insurance Company, herein called the **Insurer**) |

**Item 1.   NAMED INSURED**

KTS HOLDINGS LLC
DBA Soar Transportation Group
977 West 2100 South
Salt Lake City, UT 84119

**Item 2.   POLICY PERIOD**

Inception Date: 05/01/2019   Expiration Date: 05/01/2020

(12:01 AM standard time at the address shown in Item 1)

**Item 3.   COMBINED POLICY AGGREGATE LIMIT OF LIABILITY:** ☐ YES ☒ NO

If "Yes" is checked above the Combined Policy Aggregate Limit of Liability for all **Claims** under all **Liability Coverage Parts** is N/A

**Item 4.   COVERAGE PARTS APPLICABLE TO THIS POLICY**

| Coverage Part | Yes | No |
|---|:---:|:---:|
| Directors & Officers and Entity Liability Coverage Part | ☐ | ☒ |
| Employment Practices Liability Coverage Part | ☐ | ☒ |
| Fiduciary Liability Coverage Part | ☐ | ☒ |
| Cyber Privacy & Security Coverage Part | ☐ | ☒ |
| Crime Coverage Part | ☒ | ☐ |
| Kidnap & Ransom Coverage Part | ☐ | ☒ |



**HANOVER**

# Private Company Advantage

| | | |
|---|---|---|
| **Item 5.** | **COVERAGE PREMIUM** | $4,258.00 |
| | | N/A |
| | **Total Amount:** | **$4,258.00** |

**Item 6.**  **ENDORSEMENTS EFFECTIVE AT INCEPTION:**  See Schedule of Forms attached.

**Item 7.**  **NOTICE TO INSURER**
Report a claim to the Company as required to:

The Hanover Insurance Company
P.O. Box 15145
Worcester, MA  01615

**National Claims Telephone Number**:  800-628-0250
**Facsimile:**  800-399-4734
**Email:**  firstreport@hanover.com

Agent on behalf of:          VANBRIDGE

210 HUDSON ST STE 601

JERSEY CITY NJ  07311

We have caused this Policy to be signed by our President and Secretary and countersigned where required by a duly
authorized agent of the Company.

John C. Roche, President

Charles F. Cronin, Secretary



**Common Policy Terms and Conditions**

**_THIS IS A CLAIMS-MADE COVERAGE WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY._**
**_PLEASE READ THE POLICY CAREFULLY._**

In consideration of the premium paid, in reliance upon the statements in the **Application** and subject to the Declarations, limitations, conditions, definitions and other provisions of this Policy, including endorsements hereto, the **Insurer** and the **Insureds** agree as follows:

**I.   COMMON TERMS AND CONDITIONS**

The Common Policy Terms and Conditions of this Policy shall apply to all Coverage Parts. Unless stated to the contrary in any Coverage Part, the terms and conditions of each Coverage Part of this Policy shall apply only to that Coverage Part and shall not apply to any other Coverage Part of this Policy. If any provision in this Common Policy Terms and Conditions is inconsistent or in conflict with the terms and conditions of any Coverage Part, the terms and conditions of such Coverage Part shall control for purposes of that Coverage Part. Any defined term referenced in this Common Policy Terms and Conditions and also defined in a Coverage Part shall, for purposes of coverage under that Coverage Part, have the meaning set forth in that Coverage Part, unless otherwise stated.

**II.   DEFINITIONS**

**Application** means:

A.  Any portion of an application given to the **Insurer** for this Policy including any attachments, written information and materials provided to the **Insurer** by or on behalf of an **Insured** for the purposes of the **Insurer's** underwriting of this Policy; and

B.  Any warranty provided to the **Insurer** within the past three years in connection with any coverage part or policy of which this Policy is a renewal or replacement.

**Claim** shall have the meaning as defined in the applicable Coverage Part.

**Defense Expenses** shall have the meaning as defined in the applicable Coverage Part.

**Executive** means any natural person who is, was, or shall become:

A.  A duly-elected or appointed director, officer, manager, in-house general counsel, or trustee of the **Insured Entity**;

B.  A duly elected or appointed manager or member of a Board of Managers of a Limited Liability Company, boards, committees or other units operated under the **Insured Entity's** charter or with the **Insured Entity's** written approval; or

C.  Any person holding an equivalent position to those described in A. and B. above in any **Insured Entity** incorporated, formed or organized anywhere in the world.

**Insured** shall have the meaning as defined in the applicable Coverage Part.

**Insured Entity** means the **Named Insured** and any **Subsidiary**.

**Insured Individual** shall have the meaning as defined in the applicable Coverage Part.

**Insurer** means the entity issuing this Policy as designated in the Policy Declarations.

**Liability Coverage Part** means individually or collectively: the Directors, Officers and Entity Liability, Employment Practices Liability and Fiduciary Liability Coverage Parts; and Insuring Agreements A. Privacy and Security Liability and B. Cyber Media Liability of the Cyber Privacy and Security Coverage Part, if purchased and as set forth in Item 4. of the Policy Declarations.

**Loss** shall have the meaning as defined in the applicable Coverage Part.

_Exhibit A - Page 14_



**Common Policy Terms and Conditions**

**Named Insured** means the entity designated in Item 1. of the Policy Declarations.

**Non-Liability Coverage Part** means individually or collectively:

A.   The Crime Coverage Part and Kidnap & Ransom Coverage Part; and

B.   Insuring Agreements C. through I. of the Cyber Privacy and Security Coverage Part;

If purchased and as set forth in Item 4. of the Policy Declarations.

**Policy Period** means the period of time from the inception date shown in Item 2. of the Policy Declarations to the earlier of the expiration date shown in Item 2. of the Policy Declarations or the effective date of termination of this Policy.

**Pollutants** means any solid, liquid, gaseous or thermal irritants or contaminants, including smoke, vapors, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**Related Claims** means all **Claims** based upon, arising from or in any way related to the same facts, circumstances, situations, transactions, results, damage or events or the same series of facts, circumstances, situations, transactions, results, damage or events.

**Related Wrongful Act** shall have the meaning as defined in the applicable Coverage Part.

**Subsidiary** means:

A.   Any entity in which an **Insured Entity** owns more than fifty percent (50%) of the outstanding securities representing the right to vote for election of or to appoint directors, trustees, managers, member of the Board of Managers or equivalent positions of such entity are owned or controlled by the **Named Insured**, directly or through one or more **Subsidiaries**;

B.   Any entity while:

1.   Exactly fifty percent (50%) of the securities representing the right to vote for election of or to appoint directors, trustees, managers, members of the Board of Managers, or equivalent positions of such entity are owned, or controlled by the **Named Insured**, directly or through one or more **Subsidiaries**; and

2.   The **Named Insured**, pursuant to a written contract with the owners of the remaining and outstanding voting stock of such entity, solely controls the management and operation of such entity; or

C.   Any foundation or charitable trust while such entity is controlled by the **Named Insured**.

Coverage shall apply to a **Subsidiary** only during the time it qualifies as a **Subsidiary**.

**Wrongful Act** shall have the meaning as defined in the applicable Coverage Part.

III.   **EXCLUSIONS**

This insurance does not apply to **Loss** for any **Claim**:

A.   Pollution

Based upon, arising out of or in any way related to:

The actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of **Pollutants**;

1.   **Loss**, cost or expense arising out of any request, demand, order or statutory or regulatory requirement that any **Insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of **Pollutants**; or

2.   Any regulation, direction, request or order by or on behalf of a governmental authority to test for, monitor, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of **Pollutants**.

*Exhibit A - Page 15*



**Common Policy Terms and Conditions**

B. <u>Nuclear</u>

Based upon, arising out of or in any way related to the radioactive, toxic, or explosive properties of nuclear material which includes, but is not limited to, Source Material, Special Nuclear Material and Byproduct Material as those terms are defined in the Atomic Energy Act of 1954 and any amendments thereto, and any similar provisions of any federal, state or local statutory or common law.

**IV.   LIMIT OF LIABILITY**

A. If the Combined Policy Aggregate Limit of Liability in Item 3. of the Policy Declarations is elected, the amount stated shall be the **Insurer's** maximum liability for all **Loss** during the **Policy Period** arising from a **Claim** or **Related Claims** under one or more **Liability Coverage Parts** combined.  However, any **Loss** paid under a **Liability Coverage Part** shall not exceed the Maximum Aggregate Limit of Liability stated in Item 3. of the respective Coverage Part Declarations.

B. If the Combined Policy Aggregate Limit of Liability in Item 3. of the Policy Declarations is not elected, the **Insurer's** maximum liability for all **Loss** during the **Policy Period** arising from a **Claim** or **Related Claims** under each **Liability Coverage Part** shall not exceed the Maximum Aggregate Limit of Liability stated in Item 3. of the respective Coverage Part Declarations.

**V.   SPOUSES, DOMESTIC PARTNERS, ESTATES AND LEGAL REPRESENTATIVES**

Solely with respect to the **Liability Coverage Parts**, coverage shall extend to:

A. A lawful spouse or domestic partner, as defined under any applicable federal, state or local law, of an **Insured Individual** solely by reason of such person's status as spouse or domestic partner or such person's ownership interest in property which the claimant seeks as recovery from an **Insured Individual**;

B. The estate, heirs, legal representatives or assigns of an **Insured Individual** if such **Insured Individual** is deceased, legally incompetent, insolvent or bankrupt.

Coverage shall not apply to **Loss** for **Claims** for any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by an **Insured Individual's** spouse, domestic partner, heir, estate, legal representative or assigns.

**VI.   RELATED CLAIMS**

With respect to the **Liability Coverage Parts** all **Related Claims** will be considered as a single **Claim** made in the **Policy Period** or Extended Reporting Period in which the earliest of such **Related Claims** was first made or first deemed to have been made pursuant to the applicable Coverage Part.  All **Related Claims** are subject to the Limits of Liability, Retention and other terms and conditions applicable to the earliest **Related Claim**.

**VII.   LEGAL PROCEEDINGS**

A. No individual or entity has a right under this Policy to join the **Insurer** as a party or otherwise bring us into a suit asking for damages from an **Insured** or to sue the **Insurer** on this Policy unless all of its terms have been fully complied with.

B. An individual or entity may sue us to recover on an agreed settlement or on a final judgment against an **Insured** but the **Insurer** will not be liable for damages that are not payable under the terms of this Policy or

*Exhibit A - Page 16*



**Common Policy Terms and Conditions**

that are in excess of the applicable Limit of Liability. An agreed settlement means a settlement and release of liability signed by us, the **Insured** and the claimant or the claimant's legal representative.

**VIII.   CHANGE IN CONTROL OR EXPOSURE**

A.  Acquisition of the **Named Insured**

If during the **Policy Period**:

1.  Another individual, entity or group of individuals or entities acquires more than fifty percent (50%) of the assets of the **Named Insured**; or

2.  Another individual, entity or group of individuals or entities acquires more than fifty percent (50%) of outstanding securities representing the right to vote for the election of directors, trustees, members of the Board of Managers or management committee members of the **Named Insured**;

3.  The **Named Insured** consolidates or merges with another entity and the **Named Insured** is not the surviving entity; or

4.  The **Named Insured** emerges from bankruptcy on an effective date stated in the plan of reorganization;

Then the applicable coverage under this Policy with respect to:

a.  **Liability Coverage Parts** shall continue until the termination or expiration of the **Policy Period** but only for **Claims** for a **Wrongful Act** which occurs prior to the transaction date of such event;

b.  **Non**-**Liability Coverage Parts** shall terminate as of the transaction date of such event.

The **Named Insured** shall notify the **Insurer** of such transaction as soon as practicable but no later than sixty (60) days after the effective date of the transaction, and provide such additional information as the **Insurer** requires.

B.  Cessation of Subsidiaries

If before or during the **Policy Period** an **Insured Entity** ceases to be a **Subsidiary** then coverage for such **Subsidiary** and its **Insureds** shall continue until termination or expiration of this **Policy Period** but only for **Claims** for  **Wrongful Acts** prior to the date such entity ceased to be a **Subsidiary**.

C.  Acquisition of Another Organization

If before or during the **Policy Period** the **Insured Entity** acquires the voting rights of another entity such that the acquired entity becomes a **Subsidiary,** then coverage for such **Subsidiary** and its **Insureds** shall be provided but only for **Claims** for **Wrongful Acts** after the date such entity became a **Subsidiary**.

If during the **Policy Period** the **Insured Entity** acquires another entity and at the time of such acquisition the entity becomes a **Subsidiary** (or would have but for its absorption into the **Insured**) and the total assets of the acquired entity exceeded twenty five percent (25%) of the **Insured Entity** as of the beginning of the **Policy Period**, then the **Named Insured** shall agree to any amendments to the terms of this Policy, including, but not limited to, any additional premium the **Insurer** may require.

**IX.   SUBROGATION**

In the event of any payment under this Policy, the **Insurer** shall be subrogated to the extent of such payment to all of the **Insured's** rights of recovery. The **Insured** shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights, including the execution of such documents necessary to enable



**Common Policy Terms and Conditions**

the **Insurer** to effectively bring suit or otherwise pursue subrogation rights in the name of the **Insureds**, and shall do nothing to prejudice or compromise such rights without the **Insurer's** express written consent.

**X.   OTHER INSURANCE**

If other valid and collectible insurance (other than a policy that is issued specifically as excess of this Policy) is available to the **Insured** for loss covered under this Policy, then the insurance provided by this Policy shall be excess of such other insurance regardless of whether or not such insurance is primary, contributory, excess, contingent or otherwise.

**XI.   TERRITORY**

This Policy applies anywhere in the world.

**XII.   TERMINATION OF POLICY**

This Policy will terminate upon:

A.   Twenty (20) days after the receipt by the **Named Insured** of a written notice of termination from the **Insurer** based upon nonpayment of premium, unless such premium is paid within such twenty (20) day period;

B.   Receipt by the **Insurer** of written notice of termination from the **Named Insured**;

C.   Expiration of the **Policy Period**; or

D.   A date agreed upon by the **Insurer** and the **Named Insured.**

**XIII.   BANKRUPTCY**

Bankruptcy of an **Insured** shall not relieve the **Insurer** of its obligations under this Policy.

**XIV.   VALUATION AND FOREIGN CURRENCY**

All premiums, Limits, Retentions, and other amounts are expressed and payable in the currency of the United States of America. If a judgment is rendered, a settlement is denominated or another element of loss under this Policy is stated in a currency other than the United States of America dollars, then payment under this Policy shall be made in United States of America dollar equivalent determined by the rate of exchange published in the *Wall Street Journal* on the date the judgment becomes final, the amount of the settlement is agreed upon or any element of loss is due, respectively.

**XV.   ROLE OF NAMED INSURED**

By accepting this Policy, the **Named Insured** agrees that it is authorized to, and will act on behalf of all **Insureds** with respect to any rights provided under this Policy and each **Insured** agrees that the **Named Insured** shall act on its behalf with respect to all such matters.

*Exhibit A - Page 18*



**Common Policy Terms and Conditions**

**XVI.**   **TITLES AND HEADINGS**

The titles and headings in this Policy are solely for convenience and form no part of the terms and conditions of coverage.

**XVII.**   **CONFORMANCE TO LAW AND TRADE SANCTIONS**

Coverage under this Policy does not apply to the extent trade, economic sanction, insurance or other laws or regulations prohibit the **Insurer** from providing insurance.  The terms of this Policy which are in conflict with the statutes of the state in which this Policy is issued are amended to conform to those statutes.

**XVIII.**   **NOTICE**

A.   Notice to the **Insurer** of any **Claim**, Compliance Resolution Notice or circumstances under any **Liability Coverage Part** or any notice under any **Non-Liability Coverage Part** shall be deemed notice under the Policy in its entirety

B.   All notices to the **Insurer** under this Policy of any **Claim**, Compliance Resolution Notice or circumstances under any **Liability Coverage Part** or notice under any **Non-Liability Coverage Part** shall be deemed notice under the Policy in its entirety and shall be given in writing to the **Insurer** at the address shown in Item 7. of the Policy Declarations.

**XIX.**   **RESCINDABILITY**

The **Insurer** shall not be entitled under any circumstances to void or rescind this Policy with respect to any **Insured**.

 POLICYHOLDER NOTICE

# U.S. TREASURY DEPARTMENT'S
# OFFICE OF FOREIGN ASSETS CONTROL ("OFAC")
# ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this policyholder notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this notice carefully.**

The Office of Foreign Assets Control ("OFAC") administers and enforces sanctions policy, based on Presidential Declarations of National Emergency.

OFAC has identified and listed numerous foreign agents, front organizations, terrorists, terrorists organizations, and narcotic traffickers as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site: http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated United States sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC.

Other limitations on the premiums and payments also apply.



POLICYHOLDER NOTICE

# CUSTOMER NOTICE OF PRIVACY POLICY AND PRODUCER COMPENSATION PRACTICES DISCLOSURES—PRIVACY POLICY DISCLOSURE

### *Collection of Information*

We collect personal information so that we may offer quality products and services. This information may include, but is not limited to, name, address, Social Security number, and consumer reports from consumer reporting agencies in connection with your application for insurance or any renewal of insurance. For example, we may access driving records, insurance scores or health information. Our information sources will differ depending on your state and/or the product or service we are providing to you. This information may be collected directly from you and/or from affiliated companies, non-affiliated third parties, consumer reporting agencies, medical providers and third parties such as the Medical Information Bureau.

We, and the third parties we partner with, may track some of the web pages you visit through cookies, pixel tagging or other technologies. We currently do not process or comply with any web browser's "do not track" signals or similar mechanisms that request us to take steps to disable online tracking. For additional information regarding online privacy, please see our online privacy statement, located at www.hanover.com.

### *Disclosure of Information*

We may disclose non-public, personal information you provide, as required to conduct our business and as permitted or required by law. We may share information with our insurance company affiliates or with third parties that assist us in processing and servicing your account. We also may share your information with regulatory or law enforcement agencies, reinsurers and others, as permitted or required by law.

Our insurance companies may share information with their affiliates, but will not share information with non-affiliated third parties who would use the information to market products or services to you.

Our standards for disclosure apply to all of our current and former customers.

### *Safeguards to Protect Your Personal Information*

We recognize the need to prevent unauthorized access to the information we collect, including information held in an electronic format on our computer systems. We maintain physical, electronic and procedural safeguards intended to protect the confidentiality and integrity of all non-public, personal information, including but not limited to social security numbers, driver's license numbers and other personally identifiable information.

### *Internal Access to Information*

Access to personal, non-public information is limited to those people who need the information to provide our customers with products or services. These people are expected to protect this information from inappropriate access, disclosure and modification.

### *Consumer Reports*

In some cases, we may obtain a consumer report in connection with an application for insurance. Depending on the type of policy, a consumer report may include information about you or your business, such as:

- character, general reputation, personal characteristics, mode of living;
- credit history, driving record (including records of any operators who will be insured under the policy); and/or
- an appraisal of your dwelling or place of business that may include photos and comments on its general condition.

*Exhibit A - Page 21*



POLICYHOLDER NOTICE

### *Access to Information*

Upon written request, we will inform you if we have ordered an investigative consumer report. You have the right to make a written request within a reasonable period for information concerning the nature and scope of the report and to be interviewed as part of its preparation. You may obtain a copy of the report from the reporting agency and, under certain circumstances, you may be entitled to a copy at no cost.

You also may review certain information we have about you or your business in our files. To review information we maintain in our files about you or your business, please write to us, providing your complete name, address and policy number(s), and indicating specifically what you would like to see. If you request actual copies of your file, there may be a nominal charge.

We will tell you to whom we have disclosed the information within the two years prior to your request. If there is not a record indicating that the information was provided to another party, we will tell you to whom such information is normally disclosed.

There is information that we cannot share with you. This may include information collected in order to evaluate a claim under an insurance policy, when the possibility of a lawsuit exists. It may also include medical information that we would have to forward to a licensed medical doctor of your choosing so that it may be properly explained.

### *Correction of Information*

If after reviewing your file you believe information is incorrect, please write to the consumer reporting agency or to us, whichever is applicable, explaining your position. The information in question will be investigated. If appropriate, corrections will be made to your file and the parties to whom the incorrect information was disclosed, if any, will be notified. However, if the investigation substantiates the information in the file, you will be notified of the reasons why the file will not be changed. If you are not satisfied with the evaluation, you have the right to place a statement in the file explaining why you believe the information is incorrect. We also will send a copy of your statement to the parties, if any, to whom we previously disclosed the information and include it in any future disclosures.

### *Our Commitment to Privacy*

In the insurance and financial services business, lasting relationships are built upon mutual respect and trust. With that in mind, we will periodically review and revise our privacy policy and procedures to ensure that we remain compliant with all state and federal requirements. If any provision of our privacy policy is found to be non-compliant, then that provision will be modified to reflect the appropriate state or federal requirement. If any modifications are made, all remaining provisions of this privacy policy will remain in effect. For more detailed information about our customer privacy policy (including any applicable state-specific policies) and our online privacy statement, visit our Web site, located at www.hanover.com.

### *Further Information*

If you have questions about our customer privacy policy (including any applicable state-specific policies) or our online privacy statement, or if you would like to request information we have on file, please write to us at our Privacy Office, N435, The Hanover Insurance Group, Inc., 440 Lincoln Street, Worcester, MA 01653. Please provide your complete name, address and policy number(s). A copy of our Producer Compensation Disclosure is also available upon written request addressed to the attention of the Corporate Secretary, N435, The Hanover Insurance Group, 440 Lincoln Street, Worcester, MA 01653.

### Producer Compensation Disclosure

Our products are sold through independent agents and brokers, often referred to as "Producers." We may pay Producers a fixed commission for placing and renewing business with our company. We may also pay additional commission and other forms of compensation and incentives to Producers who place and maintain their business with us. Details of our Producer compensation practices may be found at www.hanover.com.

*Exhibit A - Page 22*



POLICYHOLDER NOTICE

This notice is being provided on behalf of the following Hanover Companies: The Hanover Insurance Group, Inc. - Allmerica Financial Alliance Insurance Company - Allmerica Financial Benefit Insurance Company - Allmerica Plus Insurance Agency, Inc. - Citizens Insurance Company of America - Citizens Insurance Company of Illinois - Citizens Insurance Company of the Midwest - Citizens Insurance Company of Ohio - Citizens Management, Inc. - AIX Ins. Services of California, Inc.- Campania Insurance Agency Co. Inc. - Campmed Casualty & Indemnity Co. Inc. - Chaucer Syndicates Limited- Educators Insurance Agency, Inc.- Hanover Specialty Insurance Brokers, Inc. - The Hanover American Insurance Company - The Hanover Insurance Company - The Hanover New Jersey Insurance Company - The Hanover National Insurance Company - Hanover Lloyd's Insurance Company - Massachusetts Bay Insurance Company - Opus Investment Management, Inc. - Professionals Direct Insurance Services, Inc. -Professional Underwriters Agency, Inc. - Verlan Fire Insurance Company - Nova Casualty Company - AIX Specialty Insurance Company.



| | |
|---|---|
| Coverage Part: Common Policy Terms and Conditions | Endorsement Number: 1 |
| Issued To: KTS HOLDINGS LLC | Policy Number: BDY-1050709-03 |
| Issued By: The Hanover Insurance Company | Effective Date: 05/01/2019 |

# SCHEDULE OF FORMS

To be attached to and form part of the Policy Number listed above.

Common Policy Terms and Conditions

| | | |
|---|---|---|
| 904-1002 | 01/14 | Private Company Advantage Policy Declarations |
| 904-1001 | 10/15 | Common Policy Terms and Conditions |
| 904-7100 PHN | 01/14 | U.S. Treasury Department's Office Of Foreign Assets Control ("OFAC") Advisory Notice To Policyholders |
| 904-7107 PHN | 12/14 | Privacy Policy and Producer Compensation Practices Disclosures-Privacy Disclosure |
| 904-1025 | 01/14 | Schedule of Forms |
| 904-6043 | 10/15 | Utah State Amendatory Endorsement |

Crime Coverage Part

| | | |
|---|---|---|
| 908-1002 | 01/14 | Crime Coverage Part Declarations |
| 908-1001 | 10/15 | Crime Coverage Part |
| 908-1155 | 10/15 | Funds Transfer Fraud - False Pretenses Coverage |
| 908-1173 | 04/17 | Vanbridge Crime Enhancement Endorsement |
| 908-3042 | 01/14 | Designated Individuals or Classes of Individuals as Employees |

All other terms and conditions remain unchanged. The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.



Endorsement

| | |
|---|---|
| Coverage Part: Common Policy Terms and Conditions | Endorsement Number: 2 |
| Issued To: KTS HOLDINGS LLC | Policy Number: BDY-1050709-03 |
| Issued By: The Hanover Insurance Company | Effective Date: 05/01/2019 |

# UTAH STATE AMENDATORY ENDORSEMENT

In consideration of the premium charged it is agreed that:

A.  Section X. Other Insurance is deleted and replaced by:

    **X.  OTHER INSURANCE**

    If other valid and collectible insurance (other than a policy that is issued specifically as excess of this Policy) is available to the **Insured** for **Loss** covered under this Policy, then the insurance provided by this Policy will contribute on a pro rata basis with any other insurance.  In such instance, pro rata means that the **Insurer** will not be liable for a greater portion of such **Loss** than the applicable Limit of Liability stated in this Policy bears to the total applicable Limit of Liability of all valid and collectible insurance of the **Insured** against such **Loss**.

B.  Section XII. Termination of Policy is deleted and replaced by:

    **XII.  TERMINATION / RENEWAL OF POLICY**

    A.  This Policy will terminate upon:

        1.  Ten (10) days after receipt by the **Named Insured** of a written notice of termination from the **Insurer,** based upon nonpayment of premium, unless such premium is paid within such ten (10) day period;

        2.  Thirty (30) days after receipt by the **Named Insured** of a written notice of termination from the **Insurer,** for any other reason if this Policy has been in effect for less than sixty (60) days and is not a renewal policy issued by the **Insurer**; or for one or more of the following other reasons if this Policy has been in effect for sixty (60) days or more, or is a renewal of a policy the **Insurer** issued:

            a.  Material misrepresentation;

            b.  Substantial change in the risk assumed, unless the **Insurer** should reasonably have foreseen the change or contemplated the risk when entering into the contract;

            c.  Substantial breaches of contractual duties, conditions or warranties.

        3.  Receipt by the **Insurer** of written notice of termination from the **Named Insured**;

        4.  Expiration of the **Policy Period**; or

        5.  A date agreed upon by the **Insurer** and the **Named Insured.**

    B.  This Policy may be non-renewed by the **Insurer** by sending written notice to the **Named Insured** not less than thirty (30) days prior to the expiration of the **Policy Period.**

All other terms and conditions remain unchanged. The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

*Exhibit A - Page 25*



Endorsement

| | |
|---|---|
| Coverage Part: Common Policy Terms and Conditions | Endorsement Number: 2 |
| Issued To: KTS HOLDINGS LLC | Policy Number: BDY-1050709-03 |
| Issued By: The Hanover Insurance Company | Effective Date: 05/01/2019 |

C.   Notice of termination or nonrenewal will be mailed by first class mail to the **Named Insured's** last known address with a statement of the specific reasons for cancellation or nonrenewal.

D.   Notice of renewal at the terms and rates applicable at the expiration date of the **Policy Period** will be mailed to the **Named Insured's** last known address not more than forty five (45) days or less than fifteen (15) days before expiration of the **Policy Period**.  The notice will state the renewal premium, how the renewal premium may be paid, and that failure to pay the renewal premium by the due date extinguishes the **Named Insured's** right to renewal.

C.   Section XVIII. Notice is amended to include:

Notice given by or on behalf of the **Insured** to any authorized agent of the **Insurer** within the State of Utah, with particulars sufficient to identify the Policy, is notice to the **Insurer**.  Failure to give any notice required by the Policy within the time specified does not invalidate a **Claim** made by the **Insured** if the **Insured** shows that it was not reasonably possible to give the notice within the prescribed time and that notice was given as soon as reasonably possible.

All other terms and conditions remain unchanged. The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

# Private Company  Advantage

### Crime Insurance Coverage Part

## Crime Declarations

**PLEASE READ ALL TERMS AND CONDITIONS CAREFULLY**

| **Policy Number** | **The Hanover Insurance Company** |
|---|---|
| BDY-1050709-03 | 440 Lincoln Street<br>Worcester, Massachusetts  01653<br>(A Stock Insurance Company, herein called the **Insurer**) |

**Item 1.     NAMED INSURED**

KTS HOLDINGS LLC
DBA Soar Transportation Group
977 West 2100 South
Salt Lake City, UT 84119

**Item 2.     POLICY PERIOD**

Inception Date: 05/01/2019  Expiration Date: 05/01/2020

(12:01 AM standard time at the address shown in Item 1)

**Item 3.     INSURING AGREEMENTS, LIMITS OF LIABILITY AND RETENTIONS**

| **Insuring Agreement** | **Limits of Liability** | **Retentions** |
|---|---|---|
| A.  Fidelity | | |
|    1.   Employee Theft | $1,000,000 | $10,000 |
|    2.   ERISA Fidelity | $1,000,000 | $0 |
|    3.   Client Property | $1,000,000 | $10,000 |
| B.  Forgery or Alteration | $1,000,000 | $10,000 |
| C.  Premises Coverage | $1,000,000 | $10,000 |
| D.  Transit Coverage | $1,000,000 | $10,000 |
| E.  Computer Crime | | |
|    1.   Computer Fraud | $1,000,000 | $10,000 |
|    2.   Restoration Expense | $50,000 | $1,000 |
| F.  Funds Transfer Fraud | $1,000,000 | $10,000 |
| G.  Credit, Debit or Charge Card Fraud | $1,000,000 | $10,000 |
| H.  Money Orders and Counterfeit Money | $1,000,000 | $10,000 |



# Private Company Advantage
### Crime Insurance Coverage Part

## Crime Declarations

| Insuring Agreement (con't) | Limits of Liability | Retentions |
|---|---|---|
| I.  Personal Accounts Protection | | |
| 1.  Forgery or Alteration | $1,000,000 | $10,000 |
| 2.  Identity Fraud Reimbursement | $25,000 | $1,000 |
| J.  Investigative Expense | $100,000 | $0 |

**Item 4.    PREMIUM FOR COVERAGE PART**                                 $4,258.00

We have caused this Policy to be signed by our President and Secretary and countersigned where required by a duly authorized agent of the Company.

John C. Roche, President

Charles F. Cronin, Secretary



<span style="float:right">C r i m e   C o v e r a g e   P a r t</span>

In consideration of the premium paid, in reliance upon the statements in the **Application** and subject to the Crime Declarations, limitations, conditions, definitions and other provisions of this Coverage Part, including endorsements hereto, the **Insurer** and the **Insureds** agree as follows:

**I.     INSURING AGREEMENTS**

    A.   Fidelity

        1.   Employee Theft

The **Insurer** will pay the **Insured** for direct loss of or damage to **Money**, **Securities** or **Other Property** sustained by an **Insured** resulting from **Theft** or **Forgery** committed by an **Employee**, whether identified or not, acting alone or in collusion with others.

        2.   ERISA Fidelity

The **Insurer** will pay an **Employee Benefit Plan** for direct loss of **Money**, **Securities** or **Other Property** sustained by such **Employee Benefit Plan** resulting from fraudulent or dishonest acts, including larceny, **Theft**, embezzlement, **Forgery**, misappropriation, wrongful abstraction, wrongful conversion and willful misapplication, committed by a **Fiduciary** of any **Employee Benefit Plan**, whether identified or not, acting alone or in collusion with others.

        3.   Client Property

The **Insurer** will pay the **Insured** for direct loss of or damage to **Money**, **Securities** or **Other Property** sustained by the **Insured's Client** resulting from **Theft** committed by an identified **Employee** not in collusion with such **Client's** employees.

    B.   Forgery or Alteration

The **Insurer** will pay the **Insured** for loss directly caused by **Forgery** or alteration of a **Financial Instrument** which is:

        1.   Made, drawn by or drawn upon the **Insured**;

        2.   Made or drawn by one acting as the **Insured's** agent, or

which is purported to have been so made or drawn.

If the **Insured** is sued for refusing to pay any written **Financial Instrument** on the basis that it has been forged or altered, and the **Insured** has the **Insurer's** written consent to defend against the suit, the **Insurer** will pay for any reasonable legal fees and expenses that the **Insured** incurs and pays in such defense. The amount that the **Insurer** will pay is in addition to the Limit of Liability applicable to this Insuring Agreement.

For the purposes of this Insuring Agreement, **Financial Instrument** includes a substitute check, as defined in the Check Clearing for the 21st Century Act, and shall be treated the same as the original it replaced.

    C.   Premises Coverage

The **Insurer** will pay the **Insured** for direct loss sustained by the **Insured** resulting from:

        1.   **Robbery**, **Theft** or **Safe Burglary**, committed by a **Third Party**, of **Money** and **Securities** located inside the **Premises** or **Banking Premises**;

        2.   Loss of or damage to **Other Property** resulting from an actual or attempted **Robbery**, **Theft** or **Safe Burglary** in the **Premises**; or

        3.   Damage to the **Premises** or its exterior resulting from an actual or attempted **Robbery**, **Theft** or **Safe Burglary**;

*Exhibit A - Page 29*



4. Damage to a locked safe, vault, cash register, cash box or cash drawer located inside the **Premises** resulting from an actual or attempted **Robbery** or **Safe Burglary** of, or unlawful entry into such containers.

D. Transit Coverage

The **Insurer** will pay the **Insured** for direct loss sustained by the **Insured** resulting from:

1. **Robbery** or **Theft** of **Money** and **Securities** committed by a **Third Party**, or destruction or disappearance of **Money** and **Securities**, while **In Transit** and including while temporarily within the living quarters of a **Messenger**.
2. **Robbery** or **Theft** of **Other Property** committed by a **Third Party**, or destruction, disappearance or damage of **Other Property**, while **In Transit**.

E. Computer Crime

1. Computer Fraud

The **Insurer** will pay the **Insured** for direct loss sustained by the **Insured** of **Money**, **Securities** and **Other Property** resulting directly from **Computer Fraud**.

2. Program and Electronic Data Restoration Expense

The **Insurer** will pay the **Insured** for reasonable **Restoration Expense** that the **Insured** incurs to restore or replace damaged or destroyed **Computer Programs** or **Electronic Data** stored within the **Insured Computer System** directly caused by a **Computer Violation**.

Payment of reasonable **Restoration Expense** applies only if the **Insured** is unable to reproduce such **Computer Programs** or **Electronic Data** from back-up data copies.

Payment of reasonable **Restoration Expense** will be made to the **Insured** upon the completion of the restoration of the damaged or destroyed **Computer Programs** or **Electronic Data**.

F. Funds Transfer Fraud

The **Insurer** will pay the **Insured** for direct loss of **Money** or **Securities** resulting from a **Fraudulent Instruction** directing a financial institution to transfer, pay or deliver **Money** or **Securities** from the **Insured Transfer Account**.

G. Credit, Debit or Charge Card Fraud

The **Insurer** will pay the **Insured** for direct loss resulting from **Credit**, **Debit or Charge Card Fraud** committed by a **Third Party**.

H. Money Orders and Counterfeit Money

The **Insurer** will pay the **Insured** for direct loss resulting from the **Insured** having accepted in good faith, in exchange for merchandise, **Money** or **Securities**:

1. Money orders issued by any post office, express company or bank that are not paid upon presentation; or
2. **Counterfeit Money** that is acquired during the regular course of business.

I. Personal Accounts Protection

1. Personal Accounts Forgery or Alteration

The **Insurer** will pay the **Insured** for direct loss resulting from **Forgery** or alteration of checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in **Money** that are:

a. Made, drawn or purported to be made or drawn upon personal accounts of the **Executive**; or
b. Made, drawn or purported to be made or drawn by someone acting as an agent of the **Executive**.



For the purposes of this Insuring Agreement, a substitute check, as defined in the Check Clearing for the 21st Century Act, shall be treated the same as the original it replaced.

2.  Identity Fraud Expense Reimbursement

The **Insurer** will reimburse the **Insured**, on behalf of the **Executive**, for **Identity Fraud Expense** incurred by an **Executive** as a direct result of any **Identity Fraud**.

J.  Investigative Expense

1.  The **Insurer** will pay the **Insured** for **Investigative Expenses** to determine the amount of loss covered under any Insuring Agreement of this Coverage Part.

2.  The **Insurer** will pay the **Insured** for **Investigative Expenses** after settlement of covered loss.

## II.   DISCOVERY PERIOD

The **Insurer** will pay the **Insured** for direct loss sustained prior to the effective date of cancellation of this Coverage Part which is **Discovered** by the **Insured**:

A.  No later than ninety (90) days from the date of that cancellation; and

B.  No later than one (1) year from the date of that cancellation with regard to any **Employee Benefit Plan**.

However, this extended period to **Discover** loss terminates immediately upon the effective date of any other insurance policy obtained by the **Insured**, whether from the **Insurer** or another insurer, replacing in whole or in part the coverage afforded under this Coverage Part, whether or not such other insurance policy provides coverage for loss sustained prior to its effective date.

## III.   DEFINITIONS

**Banking Premises** means the interior of that portion of any building occupied by a banking institution or similar safe depository.

**Client** means an entity for which the **Insured** performs services for a fee or under written contract while that contract is in effect.

**Client's Premises** means the interior of that portion of any building the **Insured** occupies in conducting its business.

**Computer Fraud** means the unlawful taking of **Money**, **Securities** or **Other Property** resulting directly from a **Computer Violation**.

**Computer Program** means a set of related electronic instructions which direct the operations and functions of a **Computer System** or devices connected to it which enable the **Computer System** or devices to receive, process, store, retrieve, send, create or otherwise act upon **Electronic Data**.

**Computer System** means a computer and all input, output, processing, storage and communication facilities and equipment which are connected to such a device and which the operating system or application software used by the **Insured** are under direct operational control by the **Insured**. Off-line media libraries are deemed to be part of such **Computer System**.

**Computer Violation** means:

A.  A **Computer Virus** designed to damage or destroy a **Computer Program** or **Electronic Data**; or

B.  A natural person (other than an **Employee**) who has gained unauthorized access to the **Insured's Computer System**.



**Computer Virus** means a set of unauthorized instructions, programmatic or otherwise:

A.  Directed solely against the **Insured**; and

B.  That propagates themselves through the **Computer System** or networks;

provided such instructions were maliciously introduced by a natural person.

**Counterfeit Money** means an imitation of **Money** that is intended to deceive and to be taken as genuine.

**Credit**, **Debit or Charge Card Fraud** means the **Forgery** or alteration of, on or in, any written instrument required in connection with any transaction involving any credit, debit or charge card issued to the **Insured**, or at the **Insured's** request to any **Employee**.

**Custodian** means the **Insured**, or any of the **Insured** partners or **Members**, or any **Employee** while having care and custody of **Money**, **Securities** or **Other Property** inside the **Premises**, excluding any person while acting as a **Watchperson** or janitor.

**Digital Signature** means an electronic identifier created by computer, within, attached to, or logically associated with a record, and executed or adopted by a person with the intent to sign the record.

**Discover**, **Discovered** or **Discovery** means the time when an **Executive** or individual responsible for placing insurance, first becomes aware of facts which would cause a reasonable person to assume that a loss of a type covered by this Coverage Part has been or will be incurred and includes loss:

A.  Where the details, act or acts causing or contributing to such loss may not yet be known;

B.  Which does not exceed the Retention set forth in Item 3. of the Crime Declarations;

C.  Which is sustained prior to the inception date of any coverage under this Coverage Part; or

D.  Which is the subject of an actual or potential claim in which it is alleged that an **Insured** is liable to a **Third Party** under circumstances which, if true, would constitute a loss under this Coverage Part.

**Electronic Data** means facts or information converted to a form usable in a **Computer System**:

A.  Which does not provide instructions or directions to a **Computer System**; or

B.  Which is stored on electronic processing media for use by a **Computer Program**.

**Electronic Signature** means a **Digital Signature**, an electronic sound, symbol or process, within, attached to, or logically associated with a record and executed or adopted by a person with the intent to sign the record.

**Employee** means:

A.  Any natural person:

    1.  While in the **Insured's** service and for the first sixty (60) days immediately after termination of service, unless such termination is due to **Theft** or any other dishonest act committed by the **Employee**;

    2.  Who the **Insured** compensates directly by salary, wages or commissions; and

    3.  Who the **Insured** has the right to direct and control while performing services for the **Insured**.

B.  Any natural person who is temporarily furnished to the **Insured**:

    1.  To substitute for an **Employee** as set forth in paragraph A. above, who is on medical, military or other leave of absence; or

    2.  To meet seasonal or short-term work load conditions;

while such person is subject to the **Insured's** direction and control and performing services for the **Insured**, excluding, however, any such person while having care and custody of **Money**, **Securities** or **Other Property** outside the **Premises**.



C.  Any natural person who is leased to the **Insured** under a written agreement between the **Insured** and a labor leasing firm, to perform duties related to the conduct of the **Insured's** business, but does not mean a temporary employee as described in paragraph B. above.

D.  Any natural person who is:

1.  A trustee, officer, employee, administrator or manager, except an administrator or manager who is an independent contractor of any **Employee Benefit Plan**; or

2.  A director or trustee of the **Insured** while that person is engaged in handling **Money**, **Securities** or **Other Property** of any **Employee Benefit Plan**.

E.  Any natural person:

1.  Who is a former **Employee**, partner, **Member**, **Manager**, or **Executive** retained as a consultant while performing services for the **Insured**;

2.  Who is a non-compensated officer;

3.  While acting as a non-compensated fund solicitor during fund raising campaigns; or

4.  Who is a guest student or intern pursuing studies or duties, excluding, however, any such person while having care and custody of **Money**, **Securities or Other Property** outside the **Premises**.

F.  Any attorney retained by the **Insured**, while performing legal services for the **Insured**.

G.  Any **Employee** of an entity merged or consolidated with the **Insured** prior to the effective date of this Policy.

H.  Any of the **Insured Managers**, directors or trustees while:

1.  Performing acts within the scope of the usual duties of an **Employee**; or

2.  Acting as a member of any committee duly elected or appointed by resolution of the **Insured's** board of directors or board of trustees to perform specific, as distinguished from general, directorial acts on the **Insured's** behalf.

I.  Any **Employee** included above while on military service.

However, **Employee** does not include any agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character.

**Employee Benefit Plan** means any welfare or pension benefit plan sponsored by an **Insured Entity** whether or not subject to the Employee Retirement Income Security Act of 1974 (ERISA), as amended, and as amended by the Pension Protection Act of 2006, which is operated solely by an **Insured Entity** or jointly by an **Insured Entity** and a labor organization for the benefit of **Employees**, provided that the **Employee Benefit Plan** shall not include any multi-employer plans.

**Executive** means an **Insured Entity's** owner, natural person partner, member of the board of directors, member of the board of trustees, officer, risk manager, in-house general counsel, **Manager**, or **Member**.

**Fiduciary** means any natural person who is an **Employee**, trustee, officer, member of the board of directors, **Member**, **Manager** or an administrator of any **Employee Benefit Plan** while that person is handling **Money**, **Securities** or Other Property that belongs to any **Employee Benefit Plan**.

**Financial Instrument** means checks, drafts or similar written promises, orders or directions to pay a sum certain in **Money**, that are made, drawn by or drawn upon an **Insured Entity** or by anyone acting as an **Insured Entity's** agent, or that are purported to have been so made or drawn.

**Forgery** means the signing of the name of another person or organization with intent to deceive. It does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity, for any purpose.

**Fraudulent Instruction** means:



<div align="right">C r i m e   C o v e r a g e   P a r t</div>

A.  An electronic, telegraphic, cable, teletype, telefacsimile or telephone instruction which purports to have been transmitted by the **Insured**, but which has in fact been fraudulently transmitted by someone else without the **Insured's** knowledge or consent;

B.  A written instruction, other than a **Financial Instrument**, issued by the **Insured**, which was forged or altered by someone other than the **Insured** without the **Insured's** knowledge or consent, or which purports to have been issued by the **Insured**, but was in fact fraudulently issued without the **Insured's** knowledge or consent; or

C.  An electronic, telegraphic, cable, teletype, telefacsimile, telephone or written instruction initially received by the **Insured** which purports to have been transmitted by an **Employee**, but which was in fact fraudulently transmitted by someone else without the **Insured's** or the **Employee's** knowledge or consent.

**Identity Fraud** means the act of knowingly transferring or using, without lawful authority, a means of identification of an **Executive** with the intent to commit, aid or abet any unlawful activity that constitutes a violation of federal law or a felony under any applicable state or local law.

**Identity Fraud Expense** means:

A.  Costs of notarizing fraud affidavits or similar documents for credit agencies, financial institutions, merchants or other credit grantors that have required that such affidavits be notarized;

B.  Costs for certified mail to law enforcement agencies, credit agencies, financial institutions, merchants or other credit grantors;

C.  Costs for long distance telephone calls to law enforcement agencies, credit agencies, financial institutions, merchants or other credit grantors to report or discuss any actual **Identity Fraud**;

D.  Lost wages, up to a maximum payment of one thousand dollars ($1,000.00) per week for a maximum period of five (5) weeks, as a result of absence from employment:

  1.  To communicate with law enforcement agencies, legal counsel, credit agencies, financial institutions, merchants or other credit grantors;

  2.  To complete fraud affidavits or similar documents; or

  3.  Due to wrongful incarceration arising solely from someone having committed a crime in the **Executive's** name; provided, that lost wages shall not apply in the case of wrongful incarceration absent all charges being dismissed or an acquittal.

E.  Loan application fees for reapplying for a loan or loans when the original application is rejected solely because the lender received incorrect credit information.

F.  Reasonable attorney fees incurred, with the **Insurer's** prior written consent, for:

  1.  Defense of lawsuits brought against the **Insured Executive** by financial institutions, merchants, other credit grantors or their collection agencies;

  2.  The removal of any criminal or civil judgments wrongly entered against the **Insured Executive**; or

  3.  Challenging the accuracy or completeness of any information in a consumer credit report.

G.  Costs for daycare and eldercare incurred solely as a direct result of any **Identity Fraud Discovered** during the **Policy Period**.

But, **Identity Fraud Expense** does not include any expense or loss not listed in paragraphs A. through G. of this definition.

**In Transit** means being conveyed by the **Insured** outside the **Premises**, from one place to another and in the custody of a **Messenger**, an armored motor vehicle carrier, or another person authorized by the **Insured** to have custody of **Money**, **Securities** or **Other Property**.

<div align="right">*Exhibit A - Page 34*</div>



**Insured** means any **Insured Entity** and any **Employee Benefit Plan**.

**Investigative Expenses** means reasonable and necessary expenses (expenses other than internal corporate costs such as **Employee** salaries and wages) incurred by the **Insured** with the **Insurer's** prior written consent to establish the amount of a covered loss.  **Investigative Expenses** shall not include expenses incurred by any **Client**.

**Manager** means a person serving in a directorial capacity for a limited liability company.

**Member** means an owner of a limited liability company represented by its membership interest, who also may serve as a **Manager**.

**Messenger** means any **Executive**, **Member**, **Manager**, including a relative thereof, or **Employee** of an **Insured** while having care and custody of **Money**, **Securities** or **Other Property** outside the **Premises**.

**Money** means:

A.  Currency, coins and bank notes in current use and having a face value; and

B.  Travelers checks, register checks and money orders held for sale to the public.

**Other Property** means any tangible property other than **Money** and **Securities** that has intrinsic value.  **Other Property** does not include **Computer Programs**, **Electronic Data**, or **Computer Systems** or any property specifically excluded under this Coverage Part.

**Premises** means the interior of that portion of any building the **Insured** occupies in conducting business.

**Restoration Expense** means reasonable costs incurred by the **Insured** to reproduce **Computer Programs** or **Electronic Data** and enable the **Insured** to restore the **Insured Computer System** to the level of operational capability that existed immediately preceding a **Computer Violation**.

However, **Restoration Expense** does not include:

A.  Internal corporate costs and expenses, including **Employee** remuneration and any costs related to any legal action;

B.  Expenses incurred as a result of the reconstruction of **Computer Programs** or **Electronic Data** recorded on media, including, but not limited to, magnetic or optical media if there are no analyses files, specifications or backups of **Computer Programs** or **Electronic Data** held outside the **Premises**;

C.  Expenses incurred as a result of the reconstruction of **Computer Programs** and **Electronic Data** if the **Insured** knowingly uses illegal copies of programs;

D.  Expenses incurred to render the **Computer Programs** and **Electronic Data** usable by replacement processing equipment;

E.  Expenses incurred to design, update or improve **Computer Programs** or **Electronic Data** or to perfect their operation or performance; or

F.  Expenses incurred as a result of alteration in **Computer Programs** and **Electronic Data** held on magnetic media due to the effect of magnetic fields, incorrect usage of the **Computer Programs** and **Electronic Data**, or the obsolescence of the **Computer System**.

**Robbery** means the unlawful taking of **Money**, **Securities** or **Other Property** from the care and custody of a person by one who has:

A.  Caused or threatened to cause that person bodily harm; or

B.  Committed an obviously unlawful act witnessed by that person.

**Safe Burglary** means the unlawful taking of:



A. **Money**, **Securities** or **Other Property** from within a locked safe or vault by a person unlawfully entering the safe or vault as evidenced by marks of forcible entry upon its exterior; or

B. A safe or vault from inside the **Premises**.

**Securities** means negotiable and nonnegotiable instruments or contracts representing **Money** or **Other Property** and includes:

A. Tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

B. Evidences of debt issued in connection with credit or charge cards, which cards are not issued by the **Insured**;

but does not include **Money**.

**Theft** means the intentional unlawful taking to the deprivation of an **Insured** or **Client**.

**Third Party** means a person other than an **Insured** or **Employee**.

**Transfer Account** means an account maintained by the **Insured** at a financial institution from which the **Insured** can initiate the transfer, payment or delivery of **Money** or **Securities**:

A. By means of electronic, telegraphic, cable, teletype, telefacsimile or telephone instructions communicated directly through an electronic funds transfer system; or

B. By means of written instructions (other than those described in Insuring Agreement I.B.) establishing the conditions under which such transfers are to be initiated by such financial institution through an electronic funds transfer system.

**Watchperson** means any person the **Insured** retains specifically to have care and custody of **Money**, **Securities** or **Other Property** inside the **Premises** and who has no other duties.

IV. **EXCLUSIONS**

A. For the purpose of all Insuring Agreements this Coverage Part shall not cover:

1. Partners

Loss resulting from **Theft**, or any other dishonest act, committed by a natural person partner of an **Insured Entity**, whether acting alone or in collusion with others.  However this Exclusion shall not apply to Insuring Agreement A.2. ERISA Fidelity.

2. Prior Dishonesty

Loss caused by an **Employee** which is sustained by the **Insured** after an **Executive**, becomes aware of a **Theft** or any other dishonest or criminal act which is:

a. Valued at one thousand dollars ($1,000) or more, committed by such **Employee** while employed with or in the service of an **Insured**;

b. Valued at twenty-five thousand dollars ($25,000) or more, committed by such **Employee** prior to employment or service with an **Insured**; or

c. Committed more than ninety (90) days following the termination of such **Employee**.

3. Employees, Managers, or Executives

Loss resulting from **Theft** or any other dishonest act committed by an **Employee**, **Manager**, **Member** or **Executive** whether acting alone or in collusion with others or while performing services for the **Insured** or otherwise, except when covered under Insuring Agreements A.1., A.2. and A.3. of this Coverage Part.



4. <u>Confidential Information</u>

Loss resulting from:

a. The unauthorized disclosure of the **Insured's** confidential information including, but not limited to, patents, trade secrets, **Electronic Data**, **Computer Programs**, processing methods or customer lists; or

b. The unauthorized use or disclosure of confidential information of another person or entity which is held by the **Insured** including, but not limited to, financial information, personal information, credit card information or similar non-public information.

5. <u>Governmental Action</u>

Loss resulting from expropriation, nationalization, seizure or destruction of **Money**, **Securities** or **Other Property** by order of governmental authority.

6. <u>Indirect/Consequential Loss</u>

Loss that is an indirect or consequential loss of any kind including, but not limited to, loss resulting from:

a. The inability to realize income that the **Insured** would have realized had there been no loss of or damage to **Money**, **Securities** or **Other Property**;

b. Payment of damages of any type for which the **Insureds** are legally liable. However, The **Insurer** will pay compensatory damages arising directly from a loss covered under this Coverage Part;

c. Payment of **Investigative Expenses** except when covered under Insuring Agreement I.J. of this Coverage Part;

d. Payment of costs, fees or other expenses the **Insureds** incur in establishing the existence of loss under this Coverage Part; and

e. Fines, penalties, multiple or punitive damages that the **Insured's** incur.

7. <u>Legal Fees, Costs and Expenses</u>

Fees, costs and expenses incurred by the **Insured** which are related to any legal action, except when covered under Insuring Agreement I.J. of this Coverage Part.

8. <u>Trading</u>

Loss resulting directly or indirectly from trading, whether in the **Insured's** name or in a genuine or fictitious account. However, the **Insurer** will pay for loss resulting directly from trading in a genuine or fictitious account when covered under Insuring Agreements A.1., A.2. or A.3. of this Coverage Part.

9. <u>War and Military Action</u>

Loss or damage resulting from:

a. War, including undeclared or civil war;

b. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

c. Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

B. For the purpose of Insuring Agreement A. Fidelity, this Coverage Part shall not cover:

1. <u>Inventory Shortage</u>

Loss or that part of any loss, the proof of which as to its existence or amount is dependent upon:



    a.   An inventory computation; or

    b.   A profit and loss computation.

However, where the **Insured** establishes wholly apart from such computations that the **Insured** has sustained a loss, then the **Insured** may offer the **Insured's** inventory records and actual physical count of inventory in support of the amount of loss claimed.

2.   <u>Warehouse Receipts</u>

Loss resulting from the fraudulent or dishonest signing, issuing, canceling or failing to cancel, a warehouse receipt or any papers connected with it.

C.   For the purpose of Insuring Agreements I.C. Premises and I.D. Transit Coverage, this Coverage Part shall not cover:

1.   <u>Accounting or Arithmetical Errors or Omissions</u>

Loss resulting from accounting or arithmetical errors or omissions.

2.   <u>Exchanges or Purchases</u>

Loss resulting from the giving or surrendering of **Money**, **Securities** or **Other Property** in any exchange or purchase.

3.   <u>Fire</u>

Loss or damage resulting from fire, however caused, except:

    a.   Loss of or damage to **Money**, **Securities**; and

    b.   Loss from damage to a safe or vault.

4.   <u>Money Operated Devices</u>

Loss of **Money**, **Securities** or **Other Property** contained in any money operated device unless the amount of **Money** deposited in it is recorded by a continuous recording instrument in the device.

5.   <u>Motor Vehicles or Equipment and Accessories</u>

Loss of or damage to motor vehicles, trailers or semi-trailers or equipment and accessories attached to them.

6.   <u>Transfer or Surrender</u>

Loss of or damage to **Money**, **Securities** or **Other Property** after it has been transferred or surrendered to a person or place outside the **Premises** or **Banking Premises**:

    a.   On the basis of unauthorized instructions;

    b.   As a result of a threat to do bodily harm to any person;

    c.   As a result of a threat to do damage to **Money**, **Securities** or **Other Property**;

    d.   As a result of a threat to introduce a denial of service attack into the **Insured's Computer System**;

    e.   As a result of a threat to introduce a virus or other malicious instruction into the **Insured's Computer System** which is designed to damage, destroy or corrupt data or **Computer Programs** stored within the **Insured's Computer System**;

    f.   As a result of a threat to contaminate, pollute or render substandard the **Insured's** products or goods; or

    g.   As a result of a threat to disseminate, divulge or utilize:

       1)   The **Insured's** confidential information; or



2) Weaknesses in the source code within the **Insured's Computer System**.

However, this Exclusion does not apply with respect to Insuring Agreement I.D. Transit Coverage, to loss of **Money**, **Securities** or **Other Property** while outside the **Premises** in the care and custody of a **Messenger**, if the **Insured**:

    a) Had no knowledge of any **Threat** at the time the conveyance began; or

    b) Had knowledge of a **Threat** at the time the conveyance began, but the loss was not related to the **Threat**.

7. Vandalism

Loss from damage to the **Premises** or its exterior, or to any safe, vault, cash register, cash box, cash drawer or **Other Property** by vandalism or malicious mischief.

8. Voluntary Parting

Loss resulting from the **Insured** or anyone acting on the **Insured's** express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any **Money**, **Securities** or **Other Property**.

D. For the purpose of Insuring Agreement I.E. Computer Crime, this Coverage Part shall not cover:

1. Credit Card Transactions

Loss resulting from the use or purported use of credit, debit, charge, access, convenience, identification, stored-value or other cards or the information contained on such cards.

2. Funds Transfer Fraud

Loss resulting from a **Fraudulent Instruction** directing a financial institution to transfer, pay or deliver **Money** or **Securities** from the **Insured's Transfer Account**.

3. Inventory Shortages

Loss or that part of any loss, the proof of which as to its existence or amount is dependent upon:

    a. An inventory computation; or

    b. A profit and loss computation.

E. For the purpose of Insuring Agreement I.F. Funds Transfer Fraud, this Coverage Part shall not cover loss resulting from the use of a computer to fraudulently cause a transfer of **Money**, **Securities** or **Other Property**.

---

**V.    LIMIT OF LIABILITY**

A. Regardless of the number of **Insureds**, the most the **Insurer** will pay for each loss is the applicable Limit of Liability set forth in Item 3. of the Crime Declarations.

B. If a direct loss is covered under more than one Insuring Agreement, the maximum the **Insurer** will pay for such loss shall not exceed the largest Limit of Liability applicable under any such Insuring Agreements.

C. All loss resulting from a single act or any number of acts of the same **Employee** or **Third Party**, and all loss whether such act or acts occurred before or during the **Policy Period**, will be treated as a single loss and the applicable Limit of Liability set forth in Item 3. of the Crime Declarations will apply, subject to Section XI. Liability for Prior Losses.

D. All loss covered under Insuring Agreement I.E.2. shall be part of, and not in addition to, the Limit of Liability for Insuring Agreement I.E.1.



E.  All loss covered under Insuring Agreement J. shall be part of, and not in addition to, the Limit of Liability for the applicable Insuring Agreement as set forth in Item 3. of the Crime Declarations.

## VI.   RETENTION

A.  The **Insurer's** liability under this Coverage Part applies only to that part of loss which is excess of the applicable Retentions stated in Item 3. of the Crime Declarations.

B.  If a loss is subject to different Retentions, in different Insuring Agreements, the applicable Retentions will be applied separately to each part of such loss but the sum of such Retentions shall not exceed the largest applicable Retention.

C.  If an **Insured** receives payment under another policy or bond, after applying a deductible or retention for loss also covered under this Coverage Part, then the applicable Retention set forth in Item 3. of the Crime Declarations shall be reduced by the deductible or retention previously applied to such loss.

D.  If a loss is covered under Insuring Agreements E.1. and E.2., then only the Retention for a loss under Insuring Agreement E.1. shall be applicable.

## VII.   DISCOVERY AND PROOF OF LOSS

A.  Knowledge possessed by any **Insured** or **Discovery** by any **Insured** shall be deemed knowledge possessed by or **Discovery** by all **Insureds**.

B.  Upon **Discovery**, the **Named Insured** shall provide the **Insurer** with written notice of any loss or potential loss as soon as practicable, but in no event later than one hundred eighty (180) days after an **Executive**, chief information officer or any person responsible for the management of the **Insured's** insurance claims, or any equivalent position, **Discovers** such loss or potential loss.  The **Named Insured** shall:

1.  Furnish to the **Insurer** proof of loss, duly sworn to, with full particulars, within one hundred eighty (180) days after **Discovery**.

2.  Submit to examination under oath at the **Insurer's** request;

3.  Produce for the **Insurer's** examination all pertinent records; and

4.  Cooperate with the **Insurer** in the investigation and settlement of any loss or claim.

## VIII.   ADDITIONAL PREMISES OR EMPLOYEES

If, during the **Policy Period**, the **Insured** establishes any additional **Premises** or hires additional **Employees**, other than through consolidation or merger with, or purchase or acquisition of assets or liabilities of another entity, such **Premises** and **Employees** shall automatically be covered under this Coverage Part.  Notice to the **Insurer** of an increase in the number of **Premises** or **Employees**, which did not result from a consolidation, merger, purchase or acquisition of another entity, need not be given and no additional premium need be paid for the remainder of the **Policy Period** shown in the Crime Declarations.

## IX.   EMPLOYEE BENEFIT PLANS

A.  If any **Employee Benefit Plan** is insured jointly with any other **Employee Benefit Plan** under this Coverage Part, the **Insured** or the Plan Administrator must select a Limit of Liability for Insuring Agreement I.B. of this



Coverage Part that is sufficient to provide a Limit of Liability for each **Employee Benefit Plan** that is at least equal to that required by ERISA if each **Employee Benefit Plan** were separately insured. Then, if at the time a loss is discovered the Limit of Liability is not equal to or greater than that required by ERISA, the **Insurer** agrees to automatically increase the Limit of Liability to equal the amount required under ERISA.

B. If the **Named Insured** is an entity other than an **Employee Benefit Plan**, any payment the **Insurer** makes for loss sustained by any **Employee Benefit Plan** will be made to the **Employee Benefit Plan** sustaining the loss.

C. If two or more **Employee Benefit Plans** are **Insureds** under this Coverage Part, any payment for loss:

1. Sustained by two or more **Employee Benefit Plans**; or

2. Of commingled **Money**, **Securities** or **Other Property** of two or more **Employee Benefit Plans**;

will be made to each **Employee Benefit Plan** sustaining loss in the proportion that the Limit of Liability required for each **Employee Benefit Plan** bears to the total Limit of Liability of all **Employee Benefit Plans** sustaining loss.

D. No retention shall apply to loss sustained by an **Employee Benefit Plan** covered under this Coverage Part.

## X. DISCOVERY BASIS

Subject to Section VIII. Change in Control or Exposure of the Common Policy Terms and Conditions and Section XI. Liability for Prior Losses of this Coverage Part, coverage under this Coverage Part is available for loss sustained at any time and **Discovered** during the **Policy Period**.

## XI. LIABILITY FOR PRIOR LOSSES

If this Coverage Part replaces a policy that provided the **Insured** with an extended period of time after termination in which to discover loss and which did not terminate at the time this Coverage Part became effective the **Insurer** will not pay for loss that occurred during the **Policy Period** of that prior policy which is **Discovered** by the **Insured** during the extended period to **Discover** loss, unless the amount of loss exceeds the limit of liability and retention amount of that prior policy. In such case, the **Insurer** will pay for the excess loss subject to the terms and conditions of this Coverage Part. Any payment the **Insurer** makes for the excess loss will not be greater than the difference between the limit of liability and retention amount of that prior policy and the Limit of Liability shown in Item. 3. of the Crime Declarations. The **Insurer** will not apply the Retention shown in the Crime Declarations to this excess loss.

## XII. OWNERSHIP

A. Except as stated in XIII.B. below, **Money**, **Securities** and **Other Property** covered under this Coverage Part applies only to **Money**, **Securities** and **Other Property** owned or leased by an **Insured** or for which the **Insured** is legally liable and provided that coverage shall only apply to damage to **Premises** if the **Insured** is the owner or is legally liable for such damage.

B. With respect to Insuring Agreement I.A.3, Client Property, **Money**, **Securities** and **Other Property** covered under this Coverage Part applies only to **Money**, **Securities** and **Other Property** that a **Client** owns or leases or for which the **Client** is legally liable while the **Money**, **Securities** and **Other Property** is inside the **Client's Premises**.



Crime Coverage Part

---

XIII.   **VALUATION AND SETTLEMENT**

The **Insurer** shall pay:

A.   The actual market value of lost, damaged or destroyed **Securities** at the closing price of such **Securities** on the business day immediately preceding the day on which a loss is **Discovered**; or the cost of replacing **Securities**, whichever is less, plus the cost to post a Lost Instrument Bond;

B.   The cost of blank books, pages or tapes or other blank materials to replace lost or damaged books of account or other records;

C.   The least of:

1.   The actual cash value of the **Other Property**; or

2.   The cost to repair or replace property, other than precious metals, with that of similar quality and value,

at the time the Parent Organization complies with Section VII. Discovery and Proof of Loss, regarding the furnishing of proof of loss;

D.   The United States of America dollar value of **Money** of the country in which the loss or damage occurred as determined by the rate of exchange published in *The Wall Street Journal* on the day the loss is **Discovered**.

E.   The United States of America dollar value of any precious metals as determined by *The Wall Street Journal* Cash Prices, Precious Metals, on the day loss involving such precious metals is **Discovered**.

---

XIV.   **REPRESENTATIONS**

The declarations and statements in the **Application** for this Coverage Part are representations and the **Insurer** has relied on such representations when issuing this Coverage Part.  Such representations are incorporated into and constitute part of this Coverage Part.

---

XV.   **TERMINATION OF PRIOR BONDS OR POLICIES**

Any prior bonds or policies issued by the **Insurer** or any subsidiary or affiliate of the Hanover Insurance Company shall terminate, if not already terminated, as of the inception of this Coverage Part.

---

XVI.   **RESCINDABILITY**

The **Insurer** shall not be entitled under any circumstances to void or rescind this Policy with respect to any **Insured**.

---



Endorsement

| | |
|---|---|
| Coverage Part: Crime | Endorsement Number: 1 |
| Issued To: KTS HOLDINGS LLC | Policy Number: BDY-1050709-03 |
| Issued By: The Hanover Insurance Company | Effective Date: 05/01/2019 |

# FUNDS TRANSFER FRAUD – FALSE PRETENSES COVERAGE

In consideration of the premium charged it is agreed that:

A.   Item 3.F. of the Crime Declarations is amended to include:

| | Limits of Liability | Retentions |
|---|---|---|
| **Funds Transfer Fraud -- False Pretenses** | **$100,000** | **$10,000** |

B.   Section I.F. of Insuring Agreements is amended to include:

Funds Transfer Fraud--False Pretenses

The **Insurer** will pay the **Insured** for direct loss of **Money** or **Securities** resulting from **False Pretenses** directing an **Employee** to transfer, pay or deliver **Money** or **Securities**.

C.   Section III. Definitions is amended to include:

**False Pretenses** means the fraudulent misrepresentation of a material fact, including but not limited to social engineering, pretexting, phishing, spear phishing or any other confidence trick, by a person purporting to be an **Employee**, **Vendor** or **Client**, to an **Employee** who is authorized by an **Insured Entity** to transfer **Money** or **Securities** or instruct another **Employee** to transfer **Money** or **Securities**.

**Vendor** means a natural person or entity that has provided goods or services to an **Insured Entity** pursuant to a written agreement or other arrangement.  **Vendor** does not mean a financial institution, bank, credit union, asset manager, broker-dealer, or any other financial institution, an armored motor vehicle company or any similar entity.

D.   Section IV. Exclusions, paragraph C.8. is deleted in its entirety.

All other terms and conditions remain unchanged. The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

*Exhibit A - Page 43*



Endorsement

| | |
|---|---|
| Coverage Part: Crime | Endorsement Number: 2 |
| Issued To: KTS HOLDINGS LLC | Policy Number: BDY-1050709-03 |
| Issued By: The Hanover Insurance Company | Effective Date: 05/01/2019 |

## VANBRIDGE CRIME ENHANCEMENT ENDORSEMENT

In consideration of the premium charged it is agreed that:

### Amend Client Property Insuring Agreement

Section I.A.3. Client Property is deleted and replaced with the following:

3. <u>Client Property</u>

The **Insurer** will pay the **Insured** for direct loss of or damage to **Money**, **Securities** and **Other Property** sustained by the **Insured's Client** resulting from **Theft** committed by an identified **Employee**.

### Amend Definition of Employee (Days After Termination)

Section III.A.1. of the definition of **Employee** is deleted and replaced with the following:

A.   Any natural person:

1.   While in the **Insured's** service and for the first ninety (90) days immediately after termination of service, unless such termination is due to **Theft** or any other dishonest act committed by the **Employee**;

### Amend Definition of Employee (Include Independent Contractors)

A.   Section III. Definitions, the definition of **Employee** is amended to include the following:

Any natural person or independent contractor performing acts within the usual scope of duties of an **Employee** and while under the exclusive direction of an **Insured Entity** pursuant to a written contract.

B.   Section III. Definitions, the last sentence of the definition of **Employee** is deleted and replaced by:

However, **Employee** does not include any agent, broker, factor, commission merchant, consignee or representative of the same general character.

### Amend Definition of Computer Fraud

Section III. the definition of **Computer Fraud** is deleted and replaced with the following:

**Computer Fraud** means the use of any computer to fraudulently cause a transfer of **Money**, **Securities** or **Other Property** from inside the **Premises** or **Banking Premises**:

1.   To a person (other than a **Messenger**) outside the **Premises** or **Banking Premises**; or

All other terms and conditions remain unchanged. The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

*Exhibit A - Page 44*



# Endorsement

| | |
|---|---|
| Coverage Part: Crime | Endorsement Number: 2 |
| Issued To: KTS HOLDINGS LLC | Policy Number: BDY-1050709-03 |
| Issued By: The Hanover Insurance Company | Effective Date: 05/01/2019 |

2.  To a place outside the **Premises** or **Banking Premises**.

## Amend Prior Dishonesty Exclusion

Section IV.A.2. Prior Dishonesty exclusion is deleted and replaced with the following:

2.  Prior Dishonesty

Loss caused by an **Employee** which is sustained by the **Insured** after an **Executive** becomes aware of a **Theft** or any other dishonest or criminal act which is:

a.  Valued at twenty-five thousand ($25,000) or more, committed by such **Employee** while employed with or in the service of an **Insured**;

b.  Valued at twenty-five thousand ($25,000) or more, committed by such **Employee** prior to employment or service with an **Insured**; or

c.  Committed more than ninety (90) days following the termination of such **Employee**.

## Amend Discovery and Proof of Loss (Specific Positions)

Section VII.B. of Discovery and Proof of Loss, is deleted and replaced with the following:

B.  Upon **Discovery**, the **Named Insured** shall provide the **Insurer** with written notice of any loss or potential loss as soon as practicable, but in no event later than one hundred eighty (180) days after the Human Resources, Risk Management Department, General Counsel, or any equivalent position, **Discovers** such loss or potential loss.  The **Named Insured** shall:

1.  Furnish to the **Insurer** proof of loss, duly sworn to, with full particulars, within one hundred eighty (180) days after **Discovery**.

2.  Submit to examination under oath at the **Insurer's** request;

3.  Produce for the **Insurer's** examination all pertinent records; and

4.  Cooperate with the **Insurer** in the investigation and settlement of any loss or claim.

## Amend Acquisition Threshold (Acquisition of Another Organization)

Only as pertains to this endorsement, Section VIII.C. of Change in Control or Exposure of the Common Policy Terms and Conditions is deleted and replaced with the following:

C.  Acquisition of Another Organization

If before or during the **Policy Period** the **Insured Entity** acquires the voting rights of another entity such that the acquired entity becomes a **Subsidiary,** then coverage for such **Subsidiary** and its **Insureds** shall be provided but only for **Claims** for **Wrongful Acts** after the date such entity became a **Subsidiary**.

All other terms and conditions remain unchanged. The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.



Endorsement

Coverage Part: Crime

Issued To: KTS HOLDINGS LLC

Issued By: The Hanover Insurance Company

Endorsement Number: 2

Policy Number: BDY-1050709-03

Effective Date: 05/01/2019

If during the **Policy Period** the **Insured Entity** acquires another entity and at the time of such acquisition the entity becomes a **Subsidiary** (or would have but for its absorption into the **Insured**) and the total assets of the acquired entity exceeded fifty percent (50 %) of the **Insured Entity** as of the beginning of the **Policy Period**, then the **Named Insured** shall agree to any amendments to the terms of this Policy, including, but not limited to, any additional premium the **Insurer** may require.

All other terms and conditions remain unchanged. The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

*Exhibit A - Page 46*



Endorsement

| | |
|---|---|
| Coverage Part: Crime | Endorsement Number: 3 |
| Issued To: KTS HOLDINGS LLC | Policy Number: BDY-1050709-03 |
| Issued By: The Hanover Insurance Company | Effective Date: 05/01/2019 |

## DESIGNATED INDIVIDUALS OR CLASSES OF INDIVIDUALS AS EMPLOYEES

In consideration of the premium charged it is agreed that:

A.  This endorsement applies to the following Insuring Agreement(s):

   A. 1. Employee Theft

B.  Section III. Definitions, the definition of **Employee** is amended to include any natural person or group of natural persons listed below.

   Individuals or Classes of Individuals

   Owner Operators

All other terms and conditions remain unchanged. The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

*Exhibit A - Page 47*

# EXHIBIT B



**Kaufman Dolowich & Voluck, LLP**
135 S. LaSalle Street, Suite 2100
Chicago, Illinois 60603

Main: (312) 646-6744
Fax: (312) 896-9403

www.kdvlaw.com

**David T. Brown**
Email:   dbrown@kdvlaw.com
Direct:   (312) 646-6743

October 14, 2019

**VIA EMAIL**

Christos Georgalis
FLANNERY GEORGALIS, LLC
1375 E. 9th Street, 30th Floor
Cleveland, Ohio 44114
chris@flannerygeorgalis.com

| | |
|---|---|
| **Insured:** | KTS Holdings LLC DBA Soar Transportation Group |
| **Underwriting Co.:** | The Hanover Insurance Company |
| **Policy No.:** | BDY1050709-03 |
| **Policy Period:** | May 1, 2019 to May 1, 2020 |
| **Matter:** | In re Roscoe Atkinson |
| **Hanover Claim No.:** | 00-00037676 |
| **Our File No.:** | 035215-0032 |

Dear Mr. Georgalis:

As you know, we represent The Hanover Insurance Company ("Hanover") with respect to KTS Holdings LLC DBA Soar Transportation Group's ("Soar") submission of a putative loss incurred in relation to conduct by its former controller Roscoe Atkinson (the "Claim"), for coverage under the above-captioned Private Company Advantage Policy issued by Hanover to Soar (the "Policy").

At this time, Hanover wishes to advise Soar of its coverage position. Based on the information provided to date and as further explained below, Hanover is constrained to advise that coverage will not be afforded to the Claim under the Policy. If you disagree with Hanover's position as set forth herein upon reviewing this correspondence, please advise Hanover of any other information or documentation that you would like Hanover to consider for this matter. Hanover's coverage position is necessarily based upon the information provided to date.

**The Claim**

Soar submitted a proof of loss ("POL") for the Claim on August 6, 2019, along with certain information in support of the Claim. On September 20, 2019, Soar subsequently provided additional information regarding the Claim, pursuant to our September 6, 2019 request.

Based on the information provided, we understand that between May 25, 2018 and March 27, 2019, Roscoe Atkinson, while serving as Soar's controller, issued payments to San Tan Financial, LLC ("San Tan"), a company that Atkinson apparently owned. Atkinson used two methods to issue the payments to

San Tan, which Soar refers to as: (1) the factoring scheme and (2) checks on demand scheme.

In the factoring scheme, Atkinson created invoices (a/k/a settlements) for carriers not being used by Soar based on an old order number, with payment to be made to San Tan as a factoring company for the carrier. Atkinson then "cut the check" (which apparently involved authorizing, creating, printing, and signing the check) to pay for the fictitious invoice. Atkinson would then reverse the transaction in Soar's accounting systems. According to Soar, the factoring scheme would have been caught through the bank reconciliation, but for the fact that reconcilliation was overseen by Atkinson. Soar seeks $698,204.81 for checks issued by Atkinson pursuant to the factoring scheme.

In the checks on demand scheme, Atkinson used a function of Soar's accounting system, known as "check on demand," that allows a person to write a check to any person or entity and code it to any internal account – without having to set up the payee as an authorized vendor in Soar's system. Hanover understands that Atkinson was able to authorize, write, print, and execute checks payable to San Tan via this process on his own and without being subject to any internal control mechanism. Soar seeks $181,713.44 for checks issued by Atkinson pursuant to the checks on demand scheme.

Soar also seeks $181,713.44 purportedly incurred for certain services provided by your law firm; Skoda Minotti; and Sonoran Capital Advisors beginning in early 2019.

Hanover understands that approximately $568,000 in cash or assets seized or anticipated to be seized from Atkinson, along with potential other property seized from Atkinson, will be subject to a civil forfeiture proceeding, which Soar anticipates will result in the forfeited assets being returned to Soar or credited towards Soar's liabilities (e.g., payroll taxes not paid while Atkinson served as controller).

**Coverage Position**

The Policy includes a Crime Coverage Part, which pursuant to Section X. applies only to loss Discovered during the Policy Period (e.g., May 1, 2019 – May 1, 2020). The POL states that the putative loss at issue in the Claim was discovered on May 2, 2019. Hanover understands that Soar seeks coverage under the Policy; specifically, Insuring Agreements A.1. Employee Theft and J. Investigative Expenses.

The Policy's Crime Coverage Part provides at Section XIV. Representations that the declarations and statements in the Application for this Coverage Part are representations and Hanover has relied on such representations when issuing this Coverage Part, and that such representations are incorporated into and constitute part of this Coverage Part. Application is defined in the Common Policy Terms and Conditions to include any portion of an application given to Hanover for this Policy including any attachments, written information and materials provided to Hanover by or on behalf of Soar for the purposes of Hanover's underwriting of the Policy, and any warranty provided to Hanover within the past three years in connection with any coverage part or policy of which this Policy is a renewal or replacement. The Initial Application (defined below) was signed and submitted within three years prior to issuance of the Policy.

When Soar sought insurance coverage from Hanover, it submitted a multi-coverage application dated April 20, 2016 (the "Initial Application). Based on the representations in the Initial Application, Hanover issued to Soar a policy and renewal policies substantially similar to the Policy. Most recently, Soar submitted a renewal business application dated April 29, 2019 (the "Renewal Application") to procure the Policy. The Initial Application, the Renewal Application, and related materials provided to Hanover are referred to, collectively, as the "Application Materials." Certain statements by Soar in the Application

Materials are discussed below.

*Check Signing By Persons Responsible for Bank Account Reconciliation*

Soar answered Question 2 of the Internal Controls portion of the Crime Coverage Section in the Initial Application regarding check signing by persons responsible for bank account reconciliation as follows:

> 2.  Does someone other than the person responsible for reconciling bank accounts:
>
> Make deposits?  Yes☒ No☐    Make withdrawals? Yes☒ No☐     Sign checks?   Yes☒ No☐

Soar answered Question 1 of the Crime Coverage Section in the Renewal Application regarding check signing by persons responsible for bank account reconciliation as follows:

> 1.  Does the Applicant:
>    a.  Allow the employees who reconcile the monthly banks statements to also:
>       1)  Sign checks?                                       Yes☐ No☒

*Payment Controls*

Soar answered Question 4 of the Internal Controls portion of the Crime Coverage Section in the Initial Application regarding payment controls as follows:

> 4.  Is segregation of duties practiced in the following areas:

| | | | |
|---|---|---|---|
| Inventory management? | Yes☒ No☐ | Cash receipts? | Yes☒ No☐ |
| Vendor approval? | Yes☒ No☐ | Oversight of blank check stock? | Yes☒ No☐ |
| Purchase order approval and payment? | Yes☒ No☐ | Retail checks and credit card receipts? | Yes☒ No☐ |

Soar answered Question 4 of the Computer and Funds Transfer Controls portion of the Crime Coverage Section in the Initial Application regarding payment controls as follows:

> 4.  Are computer check writing functions separate from check authorization?                                       Yes☒ No☐

Soar answered Question 2 of the Crime Coverage Section in the Renewal Application regarding payment controls as follows:

> 2.  Does the Applicant verify invoices against a corresponding purchase order, receiving report and the authorized master vendor list prior to issuing payment?                    Yes☒ No☐

Hanover relied on the Application Materials when issuing the Policy. However, the documentation reflects, and Soar has confirmed, that persons who signed checks (including Atkinson) were also responsible for reconcilling Soar's bank accounts. This is contrary to the representations in the Application Materials. It is also of note that Soar acknowledges in the POL that "the only way to catch [the factoring scheme] would be through the bank reconciliation, which [Atkinson] oversaw."

Additionally, the documentation reflects that Atkinson issued payments without the verifications and controls described in the application materials.[1] In particular, Atkinson was able to issue payments to an unapproved payee without Soar verifying a corresponding purchase order or invoice. Further, Atkinson had the ability to authorize checks and to generate, print, and sign checks from Soar's computer system without involving another person. The foregoing is contrary to the representations in the Application Materials.

Hanover thus must decline coverage for this Claim due to the material misrepresentations contained in the Application Materials based upon the Policy's terms and applicable law.

As the material misrepresentations in the Application Materials are dispositive of coverage, Hanover does not address all other issues based on the terms of Insuring Agreements A.1. and J or any other terms, provisions, conditions, or exclusions to the Policy. Hanover reserves its rights to decline coverage, in whole or in part, for any portion of the Claim for any reason, including but not limited to all of those reasons set forth herein.

Hanover is constrained by the information submitted to date to advise that coverage will not apply for the Claim under the Policy for those reasons expressed in this correspondence. If Soar disagrees or has any other information it would like Hanover to consider regarding this matter, please provide it to the undersigned at your earliest convenience so that Hanover may take such information under consideration.

In the meantime, Hanover reserves all rights under the Policy and applicable law with respect to this Claim or any other matter, without waiver. Nothing said, or left unsaid, herein constitutes a waiver of Hanover's rights under the Policy and applicable law with respect to this Claim, or any other matter.

Very truly yours,

Kaufman Dolowich & Voluck, LLP

David T. Brown

cc:     Christopher D. Blum, KDV

        Ginger Johnson, Hanover

4822-1648-0169, v. 1

---

[1] It appears that others who previously held Atkinson's position or had similar access to Soar's accounting software had the same ability to use the checks on demand function, but may not have utilized that function.